Good morning, may it please the court. My name is David Tellickson and it is my privilege today to represent the appellant, National Products Inc. If possible, I'd like to reserve five minutes for rebuttal. But you have to keep track of your own time. All right. Because that's the total. All right, that's the total. Thank you. In April of last year, a jury here in Seattle found that Gamber-Johnson had violated the Lanham Act through its extensive distribution of a deliberately false advertisement in the form of a video called the mounting evidence video. And this mounting evidence video attacked the safety of NPI's vehicle laptop mounts. These mounts are used in police cars and a number of other vehicles. And the jury awarded ten million dollars to National Products based on a portion of Gamber's profits. And I'd like to discuss two things in general this morning. First of all, the damage issue. The trial court committed legal error by granting Gamber-Johnson's motion for judgment as a matter of law initially under 50A and then to 50B. It was decided after the trial. And Judge Robart reduced the jury's award from ten million dollars to just under five hundred thousand dollars. And second of all, I'd like to address the substantial evidence that's in the record that was presented at trial to the jury and on which the jury based its decision that this was a deliberate false ad that was extensively distributed by Gamber-Johnson. And the relief that we're seeking is a remand on the issue of damages to the trial court with instructions to reinstate the jury's ten million dollar verdict. With respect to the issue of the court's legal error in reducing the jury verdict from ten million dollars down to under five hundred thousand dollars, Judge Robart applied the wrong standard of proof. Let's assume that I agree with you, that he did apply the wrong standard of proof. What difference does it make when the statute gives him the discretionary power to reduce the award? And it seems to me that he's fairly set out the bases in terms of evaluating the exercise of his discretion. Seems to me that in his two written orders addressing it, he's set out the basis on which he has reduced the award, even if he's done so in the context of a misapplication of the law. Well, I think in order for this to be a proper discretionary reduction, and he does under the statute have that discretion, but he did not do that. He recited the law that said he had the right to do that, but then when he went through the analysis, it's clear from his analysis that he essentially applied the but-for test. Well, again, I agree with you, or assuming that I agree with you, then if his analysis also sets forth the reasons why he would be able to reduce the award as a matter of his discretion, where is the harm in the fact that he has committed legal error? Well, I think if he had done a proper discretionary analysis, he would, one of the factors that he could not have considered is that you need to prove but-for, and he did. Well, why couldn't he consider that as a matter of his discretion? Because in this case, I agree in any case that the statute talks about proving defendant's sales only, but that doesn't mean, does it, that the judge cannot exercise his discretionary analysis. If the judge is crowded with a bunch of competitors where you have one competitor who has established business and another competitor who's relatively new, the judge doesn't just have to accept on its face evidence that these are the sales and so this is the amount they receive, does he? Well, that's what the statute says. The statute says that once you've correctly done, then the burden shifts to the defendant to prove all elements of cost or other deduction. There was evidence on those things put forth by by Gamber, wasn't there? I disagree. Well, both sides put forward the evidence of cost. We had a slight disagreement. We said that there were profits of 22 some million and they said 16 somebody, so both parties put evidence of cost. I further deductions. Well, didn't they put in evidence that there were multiple competitors in this market? Well, didn't they put in evidence that they had established relationships with some of their customers? Well, didn't they put in evidence of that nature from which a judge could reasonably determine that even though this was an amount of lost sales, it doesn't fairly represent the Well, the statute in the case law says this isn't a punitive matter. This is a matter of compensatory damages only, correct? Well, under the case law, the Nishikawa case from the Supreme Court and the Meyer Brewing case from this circuit, they want to make sure that wrongdoers like Gamber Johnson cannot profit from their wrongdoing. That is definitely one of the focuses of these types of remedies. As to the evidence of a number of competitors in the market, from the video you can see that there are other competitors in the market, but that is the extent of the evidence. There was no evidence of market share. Isn't the video itself a sufficient basis on which the judge could make that determination? But he did not rely on that in his decision. He did not say that I'm reducing this award because of the effect of the other competitors. He mentioned that there were other competitors, I believe, but there's no evidence. And in fact, the evidence was that this ad was focused on NPI, that NPI was the newcomer in the market. They had the product that the Gamber Johnson marketing plan called similar. Their own president, Mr. Green, called it almost identical for half the price. And the evidence was that it was NPI that the person who was starting to take sales and was worrying them because they had a product at half the price. There is no evidence as to the cost of the other players in the market, their market shares, any effect that they had on the situation. So I do not believe that... Well, they had an expert, right? Mr. Deegan? Yes. And Mr. Deegan testified for the reason why he thought that the best way to attribute to the false advertising was the increase in Gamber's sales, correct? That's what he said. He called it a low price. And did he offer an opinion as to why that was the best way, including multiple competitors in the market? Well, I don't believe he did any analysis of the effect of any of the other competitors, but he said, he said, I did not do a competitor or I did not do a customer-by-customer analysis, which is what I believe would be necessary when you're looking at which of these customers bought for a certain reason, which did not, which would have been Gamber's burden. He mentioned Comtec as someone that he thought should be carved out because of a government contract, but there was no shred of evidence in the record that actually supported that. I think that was something that they failed to prove, and their expert had trial never established that, but that could have been something that would be an example of how a defendant, once the burden shifts, carves back and says, well, this customer you never could have gotten because we've had a contract with them for 20 years and, and your, our false advertisement did not cause those sales. Evidence of that. Mr. Tomlinson, I think I should be candid with you when I read this case and saw the $10 million, I said that's fantastic. There's no basis for that, and it just struck me as the most, I mean, you're lucky to have any damages, but Judge Robart was, to my mind, was very sensible in producing it, and you've got to really work to convince me that he was mistaken. Well, Your Honor, the law says that this is exactly how it works in this type of case. No, it doesn't. Not all the profit. Well. You're going to attribute everything to the ad. Well, it's, it's Gamber Johnson's burden to then say, and the jury reduced it from 22.5. That was wonderful. Well, I just couldn't believe it. Anybody could think that those ads produced all that business. Well, there was, Your Honor, there was a, they were the newcomer to this market. They were just coming to the market. They were getting traction. Gamber Johnson was very worried about them. They had to increase their sales force from two to seven. They had to expend large additional sums on advertising and trade shows. They had a, a stellar reputation for, for quality products, and for the first time ever, customers were coming up to them and saying, is, is your product safe? Is, is your product, does it have this problem? Does it have this problem? You, you cannot measure, uh, the, uh, damage in dollars to a, uh, reputation. Let me understand, is the ad, is it video? Yes. Well, dollars is what we're talking about. Yeah. Was the, is the ad shown, was targeted to who, as to who it was shown to? It was targeted to people who were buying these computer laptop mounts. It's, these are mounts that a police car will mount the squad car or ambulance or whatever, uh, a delivery truck. And so they're, they're, they're targeted to the distributors who sell these things and to the end users who the distributor may be trying to sell it to a fleet of a, a city who buys 200 police cars. Fairly sophisticated buyers. Yeah, how were they, how did they get this audience to, to show the video to? Well, the, the evidence is that they're, it was sent to every one of their distributors and, uh, they sent it, they passed it out at trade shows. It was on an internet site. Uh, their distributors would then, when they would get into a head to head competition with NPI, would email them or send them a physical copy and say, have you seen this video? You should look at this video and consider it in your purchasing decision. And there was evidence that people were affected by that and people did. Well, people was a little vague. Who were affected? Well, I-tronics is one general. I mean, there were two customers who, two customers. This, this is not a huge market. There are, this is, there are not a million customers. There's, these customers are big customers. For example, Comtec, I believe is two or three million dollars of the, uh, of the sales. So these customers typically buy large amounts of products. Let me ask a related question to interrupt you. I've read the statute carefully, I hope, and it seems to be a most interesting statute concerning damages. I agree that the case law interpreting it indicates that there is a right to jury trial, at least on liability. But let's say, uh, and it seems to me that you have a good argument that despite, uh, well, let's say that the jury did determine the damages to be ten million dollars and they have accepted that argument and I think there's a good basis to conclude that they did after having heard all the evidence. If the judge disagrees with the jury, doesn't the statute give the power to the judge ultimately to trump the jury and do a discretionary reduction? If the judge, uh, sets out findings of fact in the order that says these are my, the discretionary factors that I'm going to consider, the only one he considered was the, that it was a deliberate, you know, is it, is it innocent or is it deliberate? And he mentioned that factor, which is an equitable factor, and that actually weighs in the favor of NPI. Well, didn't he, didn't he write a multiple page memorandum, 23 pages, in which he set forth the reasons why he was going to reduce the award, including that he thought that the defendant's expert was more persuasive, had used a more responsible measure of damages, and even though he decided to give your, I think he decided to give your expert's profit margin to the defendant's expert's measure of damages, which increased the award he gave, he went through all the reasons why he did that, didn't he? Well, but his analysis is all about his, his believing that under Lindy Penn, he needs to apply, he misinterpreted Lindy Penn. Lindy Penn. I agree, I agree with you on that point, but that, that brings me back to our first question, which is, if he's adequately stated the reasons in here, why he exercised his discretion in the way he did, on what basis could we reverse that reduction? Well, I think under the Playboy case, they reversed this exact situation for an abuse of discretion. The district court judge in that case awarded actual damages, and the, the appellate court said, the Ninth Circuit said, that's an abuse of discretion. When you are trying to keep people from doing this sorts of acts, that's an abuse of discretion. Yeah, it was an abuse of discretion to award actual damages when they were looking for profits. And we're already conceding that, we're not even going to argue that. But what we're talking about here is, does the judge have to equate sales to profits? Well, he has to accept, absent evidence from the defendant, that the, that the profit pool is the correct one. And there was no dispute that the sales pool tied directly to the sales of these products. Let me ask another question, your time is running out. I've looked at the video, looked at the transcript. Aside from the first page or so, where it talks about breaking apart mounting systems from six manufacturers, and examining a lot from safety and design fasteners to attention to detail, and talking about stripping down and analyzing comparable vehicle parts. Is there anywhere, relating to the cross appeal, is there anywhere in that presentation that they identify that they've actually done any test of any kind whatsoever? I think when you watch the video and you read the transcript, it's in a test setting, he's got a lab coat, he's got all the testing equipment around him, he has stripped down and analyzed. I've done this with thousands of mounts in my, and he, he, he makes it very clear that he has done tests. We also had the evidence. No, no, no. I've watched the video. You know, what was the testing equipment on his coat? No, I said he had a coat on that indicated that he was... He had a white coat? Yeah. That meant he was testing. Let me ask you another question, because you don't have much time. Why should you have gotten 2 million in attorney's fees when you got a verdict of under half a million? Well, the jury found it was a deliberate... No, no. But why should the judge give you 2 million to gain half a million? Why do you deserve it? It seems vastly out of proportion. The, well, we believe that the appropriate damages are 10 million. I know you do, but what you actually got was half a million. Why do you deserve 2 million to get half a million? I can't give you the case standing here, but we've cited cases in our brief that say that the attorney's fees can exceed the damages, that it's a... But it's four times the damages. You work four times as hard to get this, instead of settling the case, which I think sensible lawyers would have done long ago. You worked and got the wrong verdict. It's reversed. You're down to half a million. Why should you get 2 million? Because it was, the jury found it was a willful, false advertisement. That doesn't determine the damage of the attorney fees. Well, the judge considered the attorney's fees and found these to be appropriate in the case law. I know he okayed it, but why should we? Tell us why you deserve 2 million for gaining half a million for your client. Because there is a deterrent effect for willful, willful violations of the Lanham Act. It's not something that the Ninth Circuit condones, and in fact, tries to do things to keep people from doing that. And the attorney's fees provisions, when someone is found to have willfully violated, the BASF case is one case that talks about this. I don't know what the ratio between the damages and the attorney's fees, but there are cases that say that the attorney's fees can exceed the damages. Do you have any ratio like this? You don't. I'm sorry? You don't have any case where the ratio is four to one. I can submit that to you by letter, Your Honor. I don't have it in front of me. Okay. Well, I think you've just about used your time and you want a couple minutes on rebuttal, so we'll give it to you. Thank you. You may proceed. May it please the Court. Good morning. Mark Paris on behalf of Gamber Johnson. Gamber created an advertisement and did a side-by-side comparison of its products with five of its competitors. Gamber never said it conducted tests. Does it have to? It has to unambiguously communicate that tests were conducted, Your Honor. Is that a question of fact or a question of law? Your Honor, it's a question that's unsupported by the evidence in this case. Well, that wasn't my question. Is it a question of fact or is it a question of law? It's a, I think it's a mixed question, Your Honor, frankly. It's a situation where- All right, so the jury has made a determination here, apparently, haven't they? They've made a determination, but it's not supported by substantial evidence, Your Honor. Well, there is a statement at the start of your video that I have stripped down and analyzed comparable vehicle mounting systems from six manufacturers. We've examined a lot from safety and design to fasteners and tension to detail. How do you analyze safety and design without conducting tests? You can analyze safety and design without conducting tests. Yeah, but does that give rise to an implication that you have conducted tests when you're doing the video in a lab coat? Your Honor, first of all, he wasn't in a lab coat. He was in a blue shirt. But setting that particular fact aside, what this court has said in Southland Sod is that there must be a specific and measurable advertisement claim of product superiority based on product testing. So what you need is an explicit test, explicit statement that says, we conducted the following tests, and based on those tests, we conclude the following. Or you need a clear implication that's completely unambiguous. Two examples, Your Honor. BASF. If we had said, akin to BASF, that our product meets military specification 1.02a and military specification 1.02a required that a specific battery of tests would have to be accomplished before you made that statement, then perhaps you're into an implicit testing situation. Or Southland Sod. In Southland Sod, they struggled with the question or they addressed the question of less is more versus 50% less mowing. What they concluded was that advertisement relating to 50% less mowing, because it was supported by a visual chart, a graph that was based on actual product testing, data compilation by the KWS Research Farm, that when that is shown in an advertisement coupled with an actual specific and measurable claim, 50% less mowing, that can perhaps qualify. But not in this situation, Your Honor. Understanding that, is there any dispute that Mr. Long himself did not analyze the six competing systems? Yeah, absolutely, Your Honor. There's a dispute with respect to that. And what is the dispute? I gathered from the trial testimony that he didn't do any such analyzation. Your Honor, what he did was exactly what he said he did on the video and what he showed, what he testified to that was prior to the video. And he sat down with Scott Zulke, and they took the various mounts apart and discussed the various features. On the video itself, that's what he did. He stripped the parts apart, made certain observations, that was the analysis. He didn't say he tested it. That is not the clear and necessary implication of saying that you conducted an analysis and investigation. But an analyze tends to suggest more than just looking at the parts, doesn't it? He did do an analysis, Your Honor. He held up various parts. He moved them apart. He explained them. Perhaps, for example, the lower tube assembly, one was one-eighth of an inch. The other was one-sixteenth of an inch. That was part of the analysis. There needs to be a clear and unambiguous message, Your Honor, a communication. Let me ask you another question. The jury apparently determined that either the ads were literally false or that they were inadequately tested sufficient to find falsity. When the jury instructions were prepared, did you enter an objection to the trial court that they needed to have a special interrogatory specifying the basis on which the jury found falsity? Your Honor, what we did, and appropriately so, was contested the inclusion of the testing instruction. I understand that you contested that. Because there wasn't a basis for that. When the judge made clear that he was going to give the testing instruction, did you argue to him that you needed to have some sort of interrogatory on which, if there were going to be two bases on which the jury found falsity, did you argue to him that he had to have the jury specify on which basis they found falsity? That is not part of the record, Your Honor. There is no indication of that. That said, under count, you don't need to do that to preserve that particular basis. And the problem, of course, Your Honor, is what this case talks about, which is we now have a situation where the jury was instructed improperly with a test-proof standard. Well, you've indicated to me already that it's a mixed question of fact and law, so how was it improper for the jury to be instructed on it? Because there was not substantial evidence establishing that a test-proof standard should go to the jury, Your Honor. And so if we determine that there was sufficient evidence on which a jury can make a factual determination that there was testing, you lose the argument? I don't think that, yes, the answer is yes, directly to your question, but I think the realities of the situation, Your Honor, is there was not substantial evidence. When you compare the facts in this case, when you look at the video, there is no test. There is no specific and measurable product test or test. We're a claim based on that, and that's what's important. If we run down that path, Your Honor, we're on a very slippery slope. We're in a situation where virtually any statement that can be tested must be tested. We're in a situation where no longer can Papa John's say, better ingredients, better pizza. No longer can Miller Lite say, great taste, less filling. No longer can Ronnie paper towels say, our paper towels are better than Scott's. This is the right one when you have goo, goop, and gluck. Well, let me ask you this. Because those can be tested, Your Honor. Yeah, I agree. Every one of those can be tested. I agree, and I understand your argument. But does Papa John's say, we have here Domino's, Little Caesars, whoever, Pizza Hut. We've done this taste analysis, and we taste the best. Can they do that? Does that imply more tasting, or more, does that imply some sort of testing? If they have done an actual comparison of the various products, and they have asserted that they have done some type of actual test, something that's actually quantifiable, then they get closer down the line, Your Honor. But simply, let me answer it differently, Your Honor. If they made the statement that we have done the following, that we have compared our pizza with Little Caesars, with Domino's, and we have had a number of various consumers who have sat down, and they have concluded that ours is the best tasting. Yes, they better darn well have done that, because that's a false statement. Yeah, but in terms of implication and substantial evidence, what if they haven't done that? But what if they've got the six pizzas and said, we've done a comparison between these six pizzas, and ours tastes the best? Is that sufficient to imply testing? I don't think that implies testing, Your Honor. What you get to is the underlying question, whether they actually performed a comparison or not. Could I ask you about one of your statements, that it was scary, what the competitor was doing? That didn't seem to be a true statement. Well, that's an opinion, Your Honor. Does it have a little bit of puffery to it? Yes, it does. Why is it an opinion? I mean, it's an opinion, but it's a fairly negative opinion, and related to a very specific characteristic. But it doesn't give rise to any implication that a test occurred. No, I'm not talking about testing. Just from a falsity standpoint, Your Honor? It's a false statement. It's scary, and they had witnesses showing it wasn't scary, it was perfectly okay. Well, that's still just verbiage, Your Honor. Whether someone can say it's scary, that troubles me, it bothers me, wow, that's crazy. It's verbiage, but it's hurtful verbiage. It's danger. But indeed, Your Honor, there was actually support for that statement. I know there was, but there was also evidence to the contrary that it shouldn't have been scary. But, Your Honor, if the statement is actually true, it's true that it was scary. But the jury had evidence before, which you could find it was false. That would have to be the necessary implication of that statement, Your Honor, and the only conclusion that could be drawn. In this situation, Your Honor, it's not simply by saying scary that that becomes actionable. Again, we're in a scenario where comparative advertising, which is a good thing, as we all recognize, as the FTC would say as well, we're in a situation where you start walking down this path and you're not going to chill that type of advertising. Okay, but tell me, if the competitor can show that his product is safe and not scary, so the statement is false, isn't it a deterrent to false advertising if we punish it? But that is the problem here, Your Honor. The plaintiff must prove the falsity of the statement, and that is what I'm suggesting. Well, but I'm suggesting to you that the competitor offered evidence that there was not a true statement about their product. Your Honor, the evidence they offered was actually not relevant to the statement. The statement that was offered is that it's scary in certain situations. For example, if you take a laptop and if an airbag releases and hits this directly here, there's no print restraints, this could happen. No. That's what we said. What they said was, if you take a laptop and it sits outside of the airbag zone, in other words, the airbag is here, the laptop was here, do you need tests to prove that it will be dislodged? We didn't make those types of certain statements. We simply talked about possibilities, all of which are true. In fact, Dave Long was familiar himself with situations where airbags had deployed, hit the back of laptops, and the laptops had been dislodged and caused physical injury. That is a true statement. It's based on actual facts. They have to prove actual falsity, Your Honor. And the biggest problem, of course, here, Your Honor, is because of the test-prove instruction, they actually didn't have to get to the heart of the claim. All they simply had to do was stand up to the jury, as they argued, and with the dominant aspect and theme of their case, as Judge Robart recognized, and say to the jury, they didn't conduct tests, therefore, they violated the Lanham Act. It ends up into an entirely different inquiry. It's not the same type of theory as actual falsity, and you run into a scenario where, again, you're back to the world of, if it can be tested, it must be tested. Your failure to test will lead you to two different things. One of which is a Lanham Act violation, and in this case, as you'll see from the closing argument, the basis for the deliberate misfinding was the failure to conduct a test. And that then leads you down the path of the presumption of materiality, of deception, of injury, and ultimately to, as you pointed out, Judge Noonan, a completely unsupportable and irrational attorney's fee award of $2 million in a case of $500,000 maximum. You have cases on that point? I have no case that supports this type of irrational ratio. But how do we assume that the irrationality comes from the plaintiff as opposed to the defendant? Isn't litigation mutual madness if you're going to approach it at this level? It can be mutual madness. There's no doubt about it, Your Honor. But from a base approach, you shouldn't have an attorney's fee award that so outstrips what the actual judgment is. Well, it only outstrips it because the judge reduced it by 2,000 percent. Well, Your Honor. I don't know that that math's right, but reduced it by a whole ton. I'm not that quick to judge that. A thousand percent, I think, is what it is. But now it's 2,000. What's important to remember here, though, Your Honor, is that reduction, as both you and Judge Noonan pointed out, was appropriate. It was based on equitable principles. But in addition, something important to remember here is we have a multiple competitor case. In this case, what the judge did improperly was exercise his equitable discretion. And he awarded the maximum amount that could arguably be sustainable from the proof because what he did was he awarded the amount under Mr. Deegan's analysis that was the maximum amount that Gamber Johnson might have benefited from the video, assuming all of the competitors in the market. Yeah. And he accepted Mr. Deegan's analysis, but the jury apparently accepted something closer to Mr. Hampton's analysis. Apparently so, Your Honor. What the jury did, of course, in our view, is inappropriately applied a test-proof standard. And they came up with a number that fantastic, I think, is a good description of it. It's hard to understand where that came from when you look at the record evidence. Again, the record evidence is that NPI suffered no harm. NPI's profits continued to move up. It didn't decrease its prices. It didn't have any type of corrective advertising. It didn't even seek goodwill as a remedy. The only direct testimony in the record, Your Honor, ITRONIX, which Mr. Tellison mentions, and Comcast. Uniform testimony, Your Honor. Consistent. Did you rely on the video? No. The video didn't affect us, didn't influence. We didn't purchase a mount because of the video, let alone the four challenge statements. The affirmative testimony in the case, Your Honor, is that nobody bought a mount because of this video. On top of that then, Your Honor, what this court did was to say, I'm going to exercise, or excuse me, what the trial court did was to exercise its equitable discretion, consistent with what the Lanham Act directs, and say, I'm going to take the best case that could be made out for NPI. And fortunately or unfortunately, it came from Gamber's own expert. And remember, the number that he posited, which was inclusive of all profits that could have been generated from the video, not just the four challenge statements, was $353,000. Okay. What Judge Robart did was take that number, and he said, as a matter of equity, after citing specifically to equitable principles on ER 15 and his ruling, excerpt of Record 15, he listed specific equitable considerations, and he exercised his discretion, and he did so appropriately. There can be no question of that. Back to your question of... Let me ask you, and I ask the question on the other side. If, in fact, we determine that the trial court applied the wrong legal test, should we determine that its application of the wrong legal test might have affected its exercise of discretion, and so we ought to remand for him to re-weigh in light of the application of the correct legal test? Your Honor, I think we get back to your original question you asked. What is the harm? What's going to happen upon that? He was crystal clear in his exercise of his discretion. He had all of this evidence before him, and he appropriately exercised his discretion. That's what would happen again, Your Honor. There's no need to do that. The record that the district court had and this court has certainly supports, substantiates, and, in fact, commands that any number above $492,332 would not be compensation. It would be a penalty. It would be a windfall to the plaintiff, and those are primary precepts and principles underlying the Lanham Act. Frankly, Judge Robart got it right with respect to his exercise of discretion. Again, test prove I have a different view with respect to that. Your Honor. If the court has further questions. Don't appear to be. Thank you very much. Thank you. Briefly on the testing, Mr. Green, the President's testimony, he went through everything and said, we didn't test that, we didn't test that, we didn't test that. They had no support for these statements that these products were going to cause injury to you with the laptops flying around the vehicles. There were four basis for findings of falsity, all of which were supported by substantial evidence and. Well, one of them was something that wasn't appropriate. That's sort of a vague statement. I'm sorry? I think one of those four was a statement that wasn't appropriate. That's a vague statement. Vague. Yeah, I understand. Appropriate is vague. Well, it said more than that. It said this is, these bolts are, well, I have the exact text here, but it said, you know, said, as to plastic, he said, trust me, folks, you can't, this isn't one of them. Plastic is not appropriate. Is that what you're referring to? Yes, not appropriate. Yeah, and he said, here's why, in challenging driving conditions or a crash, the worst thing to happen is for it to be flying around like an out-of-control missile. I think that there's substantial evidence that the jury can conclude that that is the clear implication that if you use plastic, that's what's going to happen. And we provided tests that their metal clips actually failed sooner than the plastic clips, and the jury could see that. The jury could decide the falsity without the test prove. The instruction on test prove said that was one way they could decide it, but there was also substantial evidence that that we stripped down and analyzed was also unsupported and false on its face. Getting back to the issue of discretion, I pointed to the Playboy case, which was decided on abuse of discretion. What we believe here that Judge Robart decided this as a Rule 50 motion. He did not say he was deciding this based on discretion. He clearly did. All you have to do is read the August order. It says it about 12 different times. Well, he mentions his right to have discretion, but he says I'm granting their motion under Rule 50. Okay, counsel, I think we can read it and figure out what he was saying, and you've more than used your time. All right. Thank you very much. Are there any further questions, counsel? All right. Thank you. The case just argued is submitted for decision. That concludes the court's calendar for this morning, and the court stands adjourned.
judges: Snow, Schroeder, Noonan